**IN THE UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF ARKANSAS**
**FAYETTEVILLE DIVISION**

**IN RE GLOBAL TEL*LINK**                                    **CASE NO. 5:14-CV-5275**
**CORPORATION ICS LITIGATION**

## MEMORANDUM OPINION AND ORDER

Currently before the Court are Plaintiffs Kaylan Stuart's, Dustin Murilla's, Walter Chruby's, and Rocky Hobbs's[1] Motion for Class Certification, Appointment of Class Representatives and Appointment of Class Counsel (Doc. 92) and Memorandum of Law in Support (Doc. 93-3); Defendant Global Tel*Link Corporation's ("GTL") Opposition (Doc. 99) and Statement of Facts in Response (Doc. 100); Plaintiffs' Reply (Doc. 110); GTL's Notice of Supplemental Authority (Doc. 122) and Plaintiffs' Response thereto (Doc. 123); Plaintiffs' Notices of Filing Supplemental Authority (Docs. 131, 136); and GTL's Notice of the FCC's and DOJ's Intent to Abandon and Not Defend Certain Portions of the 2015 ICS Order (Doc. 137). For the reasons given below, Plaintiffs' Motion is **GRANTED**.

## I. BACKGROUND

Plaintiffs initiated this lawsuit against GTL on September 4, 2014 as a putative class action. *See* Doc. 1. They allege that GTL obtained exclusive contracts to provide telephone services to inmates at correctional facilities throughout the United States in exchange for the payment of kickbacks to those correctional facilities known as "site commissions," and exploited these monopolies by charging unjust and unreasonable

---

[1] When this Motion was filed, Mr. Hobbs had moved to intervene but since the Court had not yet ruled on his motion, Mr. Hobbs was technically not yet a named Plaintiff in this action. The Court subsequently granted his motion to intervene. *See* Doc. 125, pp. 6–9.

rates to users of inmate calling services, including Plaintiffs, in violation of the Federal Communications Act ("FCA") as well as common law.  *See* Doc. 126, ¶¶ 1, 14–24. Specifically, Plaintiffs contend that GTL charged them excessive rates to cover the costs of site commissions it paid to correctional facilities, and charged them deposit fees that unreasonably exceeded the cost of processing deposits into prepaid accounts.  *See* Doc. 93-3, p. 23.  Plaintiffs seek to recover these allegedly unjust rates and fees through two claims for relief against GTL—one brought under 47 U.S.C. §§ 201(b) and 206, and one brought under the common-law doctrine of unjust enrichment.  *See* Doc. 126, ¶¶ 55–68.

Plaintiffs filed their Motion for Class Certification on June 10, 2016.  *See* Doc. 92. They seek certification of a nationwide class for their claims under the FCA, defined as:

> All persons in the United States[2] who, at any time within the applicable limitations period: (1) paid to use inmate calling services provided by Global Tel*Link (including its operating subsidiaries) to make or receive one or more interstate phone calls from a correctional facility during a period of time when Global Tel*Link paid the facility[3] a commission of any type in connection with the interstate calls; and/or (2) paid deposit fees to Global Tel*Link in order to fund a prepaid account used to pay for any interstate calls.

(Doc. 92, ¶ 1).  Plaintiffs also seek certification of four subclasses for their claims under the common law of unjust enrichment, defined as:

> **The Arkansas UE Subclass:** All persons who, while a resident of Arkansas, California, Connecticut, Hawaii, Indiana, Iowa, Michigan, Nebraska, New Hampshire, South Carolina, Vermont or West Virginia,

---

[2] Excluded from the proposed Class are any persons who paid to use GTL's inmate calling services in order to make or receive telephone calls from a correctional facility in New Jersey.

[3] GTL often contracts with correctional agencies, such as a state's Department of Corrections, that oversee multiple correctional facilities.  For purposes of this Motion, and consistent with industry practices, the term "facilities" or "facility" refers to the correctional facilities as well as the corresponding correctional agency overseeing the correctional facilities.

within the applicable limitations period, paid to use inmate calling services provided by Global Tel*Link (including its operating subsidiaries) to make or receive one or more interstate phone calls from a correctional facility during a period of time when Global Tel*Link paid the facility a commission of any type in connection with the interstate calls.

**The Minnesota UE Subclass:** All persons who, while a resident of Minnesota, Alaska, Ohio, Tennessee, Utah or Washington, within the applicable limitations period, paid to use inmate calling services provided by Global Tel*Link (including its operating subsidiaries) to make or receive one or more interstate phone calls from a correctional facility during a period of time when Global Tel*Link paid the facility a commission of any type in connection with the interstate calls.

**The Pennsylvania UE Subclass:** All persons who, while a resident of Pennsylvania, Georgia, Florida, Idaho, Kansas, Kentucky, Maryland, Maine, Mississippi, Missouri, New Mexico, Nevada, Oregon, South Dakota, Virginia or Wisoncsin, within the applicable limitations period, paid to use inmate calling services provided by Global Tel*Link (including its operating subsidiaries) to make or receive one or more interstate phone calls from a correctional facility during a period of time when Global Tel*Link paid the facility a commission of any type in connection with the interstate calls.

**The Texas UE Subclass:** All persons who, while a resident of Texas, Arizona, Colorado, Delaware, Illinois, Louisiana, Massachusetts, New Jersey, North Dakota or Oklahoma, within the applicable limitations period, paid to use inmate calling services provided by Global Tel*Link (including its operating subsidiaries) to make or receive one or more interstate phone calls from a correctional facility during a period of time when Global Tel*Link paid the facility a commission of any type in connection with the interstate calls.

*See id.* at ¶ 2.[4]

Plaintiffs ask that Messrs. Stuart, Murilla, Chruby, and Hobbs be appointed as representatives of the FCA Class and that each, respectively, be appointed as representative of the Arkansas, Minnesota, Pennsylvania, and Texas UE Subclasses.

---

[4] Although the original UE Subclass definitions proposed in Plaintiffs' Motion each included deposit-fee criteria identical to that in the FCA Class definition, Plaintiffs' counsel orally withdrew its Motion with respect to the unjust enrichment claim for deposit fees on November 30, 2016.  *See* Doc. 132, p. 97.

They also ask that the Court appoint the law firms of Kessler Topaz Meltzer & Check, LLP ("KTMC"), Berger & Montague, P.C. ("BM"), Saltz Mongeluzzi Barrett & Bendesky P.C. ("SMBB"), and Cohen Milstein Seller & Toll, PLLCA ("CM") as Co-Lead Class Counsel serving on a Co-Lead Class Counsel Committee, with KTMC serving as the Chair of such Committee, and Amy C. Martin, Esq.[5] as Liaison Class Counsel.  And upon such certification and appointment, they ask that this Court direct that Notice to the Class be disseminated in accordance with a Notice program to be submitted to the Court for the Court's approval.  The Motion has been fully briefed, and the Court heard oral argument on it on November 30, 2016.  It is now ripe for decision.

## II.  LEGAL STANDARD

The party seeking class certification bears the burden of proving that Rule 23's requirements are satisfied.  *See Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011).  The district court retains "broad discretion in determining whether to certify a class, recognizing the essentially factual basis of the certification inquiry and . . . the district court's inherent power to manage and control pending litigation."  *In re Zurn Pex Plumbing Prods. Liab. Litig.*, 644 F.3d 604, 616 (8th Cir. 2011) (internal quotations and citations omitted).  A district court must undertake "a rigorous analysis" to ensure that the requirements of Rule 23 are met.  *Gen. Tel. Co. of the Sw. v. Falcon*, 467 U.S. 147, 161 (1982).  "Frequently that 'rigorous analysis' will entail some overlap with the merits of the plaintiff's underlying claim."  *Wal-Mart Stores*, 564 U.S. at 351 (2011).  The district court

---

[5] Plaintiffs originally requested that Ms. Martin's law firm be appointed as Liaison Class Counsel, but she has since left that firm.

may "resolve disputes going to the factual setting of the case" if necessary to the class certification analysis.  *Blades v. Monsanto Co.*, 400 F.3d 562, 567 (8th Cir. 2005).

An implicit requirement for any class certification inquiry involves a court's assessment as to the *ascertainability* of the class.  The description of a proposed class must be sufficiently *definite* to permit class members to be identified by objective criteria.  *See Sandusky Wellness Ctr., LLC v. Medtox Sci., Inc.*, 821 F.3d 992, 996–97 (8th Cir. 2016).  "The requirement that a class be clearly defined is designed primarily to help the trial court manage the class.  It is not designed to be a particularly stringent test, but plaintiffs must at least be able to establish that the general outlines of the membership of the class are determinable at the outset of the litigation."  *Bynum v. Dist. of Columbia*, 214 F.R.D. 27, 31 (D.D.C. 2003).

Under Rule 23, certifying a class action requires a two-step analysis.  *First*, the Court must determine whether:

- the class is so numerous that joinder of all members is impracticable ("*numerosity*");

- there are questions of law or fact common to the class ("*commonality*");

- the claims or defenses of the representative parties are typical of the claims or defenses of the class ("*typicality*"); and

- the representative parties will fairly and adequately protect the interests of the class ("*fair and adequate representation*").

Rule 23(a)(1)–(4).  *Second*, the Court must determine whether:

- questions of law or fact common to class members predominate over questions affecting only individual members ("*predominance*"); and

- a class action is superior to other available methods for fairly and efficiently adjudicating the controversy ("*superiority*").

Rule 23(b)(3).

### III.  DISCUSSION

### A.  Definition and Ascertainability

The Court begins with the observation that the Eighth Circuit, "unlike most other courts of appeals, has not outlined a . . . separate, preliminary requirement" of ascertainability that would require plaintiffs to demonstrate a method of identifying class members that is administratively feasible.  *See Sandusky Wellness*, 821 F.3d at 996. Rather, the Eighth Circuit simply adheres to a rigorous analysis of the Rule 23 factors, and while it recognizes that this analysis necessarily entails that a class be "adequately defined and clearly ascertainable," the focus of this threshold inquiry is on whether the proposed class definition identifies class members by objective criteria, rather than on the administrative concerns that are already taken into account by the Rule 23(b)(3) factors of predominance and superiority.  *See id.*  Thus, a proposed class of "persons who because of their poverty are unable to pay for utility services" is *not* adequately defined and clearly ascertainable, because "the vagueness of its description" makes it "impossible to determine" who its members are.  *Ihrke v. N. States Power Co.*, 459 F.2d 566, 573 (8th Cir. 1972), *vacated due to mootness*, 409 U.S. 815 (1972).  But a proposed class of "[a]ll persons who (1) on or after four years prior to the filing of this action, (2) were sent telephone facsimile messages regarding lead testing services by or on behalf of Medtox, and (3) which did not display a proper opt out notice" *is* adequately defined and clearly ascertainable because it uses objective criteria to identify class members, regardless of

how administratively difficult it may be to locate those class members in practice. *See Sandusky Wellness*, 821 F.3d at 996–97. Again, this does not mean administrative burdens are irrelevant to a class certification inquiry; it just means inquiry into administrative burdens should be shaped and guided by the Rule 23(b)(3) factors that properly implicate them, rather than being elevated to a separate, preliminary requirement for a heightened showing that has no basis in the text of Rule 23.

Bearing these observations in mind, it is obvious that Plaintiffs' proposed class in the instant case is adequately defined and clearly ascertainable. Whether a person "paid to use inmate calling services provided by [GTL] (including its operating subsidiaries) to make or receive one or more interstate phone calls from a correctional facility during a period of time when [GTL] paid the facility a commission of any type in connection with the interstate calls" is a straightforward objective test. The same is true for whether a person "paid deposit fees to [GTL] in order to fund a prepaid account used to pay for any interstate calls." Neither of these definitions requires any sort of subjective valuation of anyone's state of mind, level of indigence, etc. in order to determine whether he or she is a member of the proposed class.

GTL's arguments that the definitional and ascertainability requirements are not met, are in large part arguments that this Court should impose a heightened threshold inquiry into administrative burdens that the Eighth Circuit has explicitly foreclosed. GTL points out that its call detail records ("CDRs") do not typically contain an inmate's name, but rather simply use a PIN, or occasionally even less, to identify the inmate. *See* Doc. 99, p. 18. But this is simply an issue of how many administrative steps it would take to identify the inmate; not a problem with the criteria for identification contained in the class

definition.  *Cf. Sandusky Wellness*, 821 F.3d at 997 ("The best objective indicator of the 'recipient' of a fax is the person who subscribes to the fax number.").  GTL also argues that its CDRs do not contain any information about who funded the prepaid accounts, who paid for a specific call, or whether the account-holder is who actually made a given call on that account.  *See id.* at 17–18.  But the Court does not see what difference it makes whether money in an account was earned through employment, donated by a friend or loved one or complete stranger, or purchased through a prepaid calling card; GTL has not provided this Court with any legal authority departing from the well-established and common-sense principle that the funds in these accounts belonged to the owners of these accounts, regardless of whether the funds were acquired through work, luck, purchase, or gift.  *Cf. In re LGI Energy Solutions, Inc.*, 460 B.R. 720, 729 (B.A.P. 8th Cir. 2011) ("Money deposited in a bank to be commingled with other funds loses its identity and the depositor ceases to be the owner of the deposit, even if the deposit is to be used for the benefit of the depositor.").  And while GTL observes that CDRs do not indicate whether GTL actually received payment for the charges billed for a given call, *see* Doc. 99, p. 18, this ignores the rather obvious rejoinder that CDRs are not the only records GTL keeps, and that payment information is readily accessible elsewhere in GTL's records.  *See, e.g.*, Doc. 93-5, p. 311 (internal GTL training document describing system of tracking individual customers' account balances by "[t]he total value of all calls since the last billed date . . . minus any payment amounts dated after the last invoice").

GTL also argues that the proposed class is not ascertainable because GTL's Account Transaction Reports ("ATRs") do not identify whether any particular deposit fee for a prepaid account was attributable to interstate or intrastate calls made on that

account.  *See* Doc. 99, p. 18.  But this misses the point.  The pertinent objective criteria in the class definition here is whether the prepaid account in question was used to pay for "any" interstate calls.  GTL's ATRs identify whether deposit fees were paid on a given account, *see, e.g.*, Doc. 93-4, pp. 2050, 2093, and GTL's CDRs identify whether interstate calls were made on that account, *see, e.g.*, Doc. 93-4, pp. 161–62.  The class definition here does not require one to analyze what percentage of the account's calls were interstate, much less to analyze what percentage of the deposit fees charged to that account were economically attributable to said interstate calls, in order to determine whether a person who paid deposit fees to fund that account is a class member.  One needs simply to determine whether *any* interstate calls were made on that account, period.  This is a simple, objective, well-defined, and easily ascertainable criterion.

There is, however, one problem with the four proposed UE Subclass definitions that was not briefed but that should nevertheless be addressed here.  Each of those definitions uses the words "while a resident of" to describe the relationship between its class members and the states where those class members allegedly suffered the wrongs they are seeking to remedy.  The Court believes this language could lead to unnecessary confusion, because some states have laws that explicitly preclude individuals from acquiring residency solely by reason of being incarcerated there.  *See, e.g.*, Tenn. Code Ann. § 2-2-122(a)(7) ("A person does not gain or lose residence solely by reason of the person's presence or absence . . . while kept in an institution at public expense, or while confined in a public prison[.]").  However, this problem is easily remedied by simply substituting the word "in" for the words "a resident of" in each of the four UE Subclass definitions.  With that caveat, Plaintiffs' proposed class is adequately defined and clearly

ascertainable.  Therefore, the Court will proceed to consider the four Rule 23(a) factors of numerosity, commonality, typicality, and fair and adequate representation.[6]

## B.  Numerosity, Commonality, Typicality, and Fair and Adequate Representation

The proposed class in this case is indisputably numerous, likely containing at least a hundred-thousand individuals, and quite possibly many more.  GTL has conceded the issue of numerosity "for all practical purposes."  (Doc. 132, p. 126).  Its sole caveat on this point is that this Court previously observed in another case that "[f]actual disputes as to standing and ascertainability of the class call into question the class's numerosity." *Littleton v. State Farm Mut. Auto. Inc. Co.*, 2015 WL 128577, at *8 (W.D. Ark. Jan. 8, 2015).  For the reasons given in the preceding subsection, the Court does not believe such concerns are present here to any significant degree.

Likewise, there are questions of law or fact common to the class.  Plaintiffs allege that GTL recoups the site commissions it pays incarceration facilities through the rates it charges users of its inmate calling services, that GTL charges fees for depositing funds in inmate prepaid accounts that grossly exceed the cost of processing those deposits, and that these practices are the result of nationwide policies rather than of ad hoc negotiations with individual consumers of GTL's services.  Plaintiffs further contend that these practices are unjust, unreasonable, and inequitable under both the FCA and the common law of unjust enrichment.  These factual allegations and legal arguments do not depend in any way on the individual circumstances surrounding individual payments by

---

[6] GTL also argued, as a threshold matter, that Plaintiffs have no representative for the proposed "deposit fee" class.  (Doc. 99, p. 19).  That argument has subsequently been mooted by this Court's granting of Mr. Hobbs's motion to intervene.  *See* Doc. 125, pp. 6–9.

class members; they are contentions that are common to the class as a whole.  And for each of these contentions, "determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke."  *Wal-Mart Stores*, 564 U.S. at 350.

It is instructive to contrast the claims in this case with those in *Luiken v. Domino's Pizza, LLC*, 705 F.3d 370 (8th Cir. 2013).  In *Luiken*, the district court had certified a class of individuals employed as delivery drivers for Domino's Pizza, who sought to recover fixed delivery charges paid by customers to Domino's which the class members contended were "gratuities" that had been wrongfully withheld from them under Minnesota statutory and administrative law.  *See* 705 F.3d at 372–73.  The Eighth Circuit reversed, holding that commonality and predominance were not satisfied, because under the plain language of the statutory definition at issue, whether a monetary contribution was a "gratuity" depended on the factual context under which a given contribution was made— and in particular, on whether a "reasonable" person making a contribution would construe that contribution as being made "for personal services," given the factual context in which it was paid.  *See id.*  But in the instant case, a class member's uniquely individual circumstances are utterly irrelevant to the questions of whether it is just or reasonable for GTL to recoup site commissions from customers of inmate calling services, or whether it is just or reasonable for GTL to charge deposit fees that exceed processing costs by $x$, $y$, or $z$ amounts.  Under Plaintiffs' theory of the case, the class rises or falls together.  If Plaintiffs ultimately prevail, then individual class members will certainly recover different amounts in accordance with how much they have paid to GTL; but this is no different from countless other properly certified class actions.  It would simply be a matter of using the

11

same records to determine the amount one may recover, as were used to determine whether one is a class member in the first place.

GTL counters that Plaintiffs' "one-size-fits-all theory" is untenable as a matter of law, *see* Doc. 99, pp. 21–24, because "we have had no pronouncement" from the Federal Communications Commission ("FCC") or any other legal authority "that site commissions are, per se, illegal," *see* Doc. 132, p. 91.  But on the other hand, this Court is also unaware of any pronouncement that they are *not*, at least with respect to their recoupment from customers.  More to the point, GTL has not provided this Court with any statutory or regulatory language that definitively forecloses, or even comes *close* to definitively foreclosing, Plaintiffs' theory of liability.  And while the Court appreciates that class certification analysis frequently "entail[s] some overlap with the merits of the plaintiff's underlying claim," *Wal-Mart Stores*, 564 U.S. at 351, that does not mean it would be appropriate for this Court to use an order on a class certification motion as a vehicle to essentially grant summary judgment, on the basis of a woefully incomplete record for that purpose, against a theory of liability that is not obviously foreclosed as a matter of law, and under a legal standard where the burden rests on Plaintiffs rather than on the party who is essentially seeking summary judgment.  Simply put, Plaintiffs contend that certain of GTL's business practices are per se unjust and unreasonable, and GTL disagrees. This disagreement is undoubtedly an interesting and intellectually stimulating one, and it may prove very difficult to resolve—but the Court is well persuaded that the core questions it poses are common to all of the class members.  If at some point down the line that disagreement is resolved in GTL's favor, perhaps at the close of merits discovery,

or even at trial, then such an occasion would be an opportune moment for GTL to move for decertification; but that is not where we are right now.[7]

Turning to the third factor under Rule 23(a): Plaintiffs' claims are quite clearly typical of the proposed class's claims, because all proposed class members' claims, including Plaintiffs', "are based on the same legal or remedial theory," *Paxton v. Union Nat. Bank*, 688 F.2d 552, 561–62 (8th Cir. 1982), which is that GTL violated the FCA and the common law of unjust enrichment by charging them exorbitant rates and deposit fees for interstate phone calls.  GTL disagrees with regard to Mr. Stuart, arguing that his claims are subject to a unique defense because he used prepaid calling cards that he did not pay for himself.  The Court has already explained in the preceding subsection why it does not find this argument persuasive.  GTL also argues, more generally, that the Plaintiffs' claims are not typical because one cannot determine whether any particular rate or fee was unreasonable without performing individualized analyses of the circumstances under which it was charged and paid.  (Doc. 132, p. 124).  The Court has already disposed of this argument in the immediately preceding paragraphs on commonality, and does not believe it presents any new issues within the context of typicality.[8]

---

[7] The Court views GTL's separate argument that "Plaintiffs have failed [to] show that damages can be assessed on a class basis," *see* Doc. 99, pp. 26–27, as essentially being a reformulation of GTL's contention that Plaintiffs' theory of the case is not legally tenable, and the Court rejects this argument for the same reasons as recited above in the body of this Opinion.

[8] GTL also argued that Mr. Murilla is subject to the unique defense that he did not make any interstate calls from 2010 to 2012, but that argument was subsequently mooted by: (1) the parties' stipulation that the class periods for the FCA and unjust enrichment claims begin on April 24, 2012, and April 24, 2011, respectively, *see* Doc. 108, p. 2, and (2) this Court's Order finding that a material dispute of fact exists as to whether Mr. Murilla made and paid for an interstate call in 2013, *see* Doc. 125, pp. 5–6.

As for the fourth factor under Rule 23(a), the Court is also easily persuaded that Plaintiffs will fairly and adequately represent the interests of the class.  Plaintiffs' interests are aligned with those of the class members, they have vigorously prosecuted their own interests through qualified counsel[9] up through the present moment in this litigation, and the Court sees no reason to believe this vigorous prosecution will abate following class certification.  *See Paxton*, 688 F.2d at 562–63.  GTL attacks the adequacy of Mr. Stuart's representation by characterizing his deposition testimony as saying that "he's not sure why he's in this case."  *See* Doc. 132, p. 123.  But this Court believes a fairer interpretation of Mr. Stuart's testimony is simply that he did not understand the more complex nuances of the legal arguments at play.  *See, e.g.*, Doc. 106-8, pp. 23–24.  Fine; that is what his lawyers are for.  Finally, although GTL makes a fleeting challenge to Mr. Chruby's honesty and integrity, arguing that he "may be disqualified based on false statements made in prison disciplinary proceedings," GTL offers no evidence to support this claim, and essentially abandoned it during oral argument on November 30, 2016.  *See* Doc. 132, p. 124.

In conclusion, then, the Court finds that all four Rule 23(a) factors of numerosity, commonality, typicality, and fair and adequate representation weigh in favor of class certification here.  Accordingly, the Court will proceed to the second step of class certification analysis, and consider the Rule 23(b)(3) factors of predominance and superiority.

---

[9] Lead counsel for Plaintiffs has extensive experience and success prosecuting class action cases, and GTL does not challenge or dispute the qualifications of Plaintiffs' counsel.

14

## C.  Predominance and Superiority

"The Rule 23(b) predominance inquiry tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation."  *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 623 (1997).  The Eighth Circuit has explained that:

> When determining whether common questions predominate, a court must conduct a limited preliminary inquiry, looking behind the pleadings, but that inquiry should be limited to determining whether, *if the plaintiffs' general allegations are true, common evidence could suffice to make out a prima facie case for the class.*  While limited in scope, this analysis should also be rigorous.

*In re Zurn Pex Plumbing Prod. Liab. Litig.*, 644 F.3d 604, 618 (8th Cir. 2011) (emphasis added) (internal citations and quotation marks omitted).  The Court believes common evidence could suffice to make out a prima facie case that, as described in the preceding subsection of this Order, GTL recoups the site commissions it pays incarceration facilities through the rates it charges users of its inmate calling services, charges fees for depositing funds in inmate prepaid accounts that grossly exceed the cost of processing those deposits, engages in these practices pursuant to nationwide policies, and that these practices are unjust and unreasonable.

GTL protests that the reasonableness of their interstate rates and deposit fees raises individualized fact issues, such as the size of different facilities, the mix of call traffic at different facilities, call recording and monitoring features at different facilities, and so forth.  *See* Doc. 99, pp. 24–26.  But this argument misapprehends Plaintiffs' theory of the case.  Plaintiffs are not contending that it is unjust or unreasonable for GTL to recoup any of those particular costs; they are contending it is unjust and unreasonable for GTL to recoup *site commissions*, and to charge deposit fees that far exceed the cost of *processing deposits* on prepaid accounts.

15

Specifically with regard to deposit fees, GTL argues that "[t]he amount of the fee and the circumstances under which a customer chooses to pay are individualized issues" that would prevent common proof from predominating.  *See* Doc. 99, p. 26.  But Plaintiffs are seeking class certification for their deposit-fee claims only under the FCA—not under the common law of unjust enrichment.  While it is true that under Arkansas common law, "payments which are voluntarily made cannot be recovered except for payments made as a result of duress, fraud, mistake or failure of consideration," the Court is unaware of any authority holding that this "voluntary payment" defense is available against claims for damages brought under the FCA's prohibition of unjust and unreasonable rates and practices under 47 U.S.C. §§ 201, 206.  And while the amount of deposit fees may vary from one individual to another, the Court has not been presented with any evidence thus far that the *cost of processing deposits* varies from one individual to another; given Plaintiffs' theory of the case, the latter issue easily predominates over the former.

In a similar vein, GTL contends that the voluntary payment doctrine and the state-law defense of derivative sovereign immunity raise individualized fact issues with respect to class members' claims that recoupment of site commissions violates the common law of unjust enrichment.  *See* Doc. 99, pp. 30–31.  The Court disagrees, at least on the basis of the record currently before it.  There is no evidence in the record that any class members who wished to use inmate calling services had the option of *not* paying recoupments of site commissions to GTL; thus, whether these rates were "voluntary" or the "result of duress" under such conditions is a question that is common among all class members.  Similarly, there is not presently any evidence in the record that GTL's provision of inmate calling services to any class members was performed "under the . . . direct

supervision" of any governmental agency, which is a necessary element of derivative sovereign immunity. *See Lopez v. Mendez*, 432 F.3d 829, 833 (8th Cir. 2005).

Relatedly, GTL points out that in approximately July 2013, it "added a mandatory arbitration and class action waiver provision to the Terms of Use . . . that govern prepaid calling accounts," and argues that individualized analysis will be necessary to determine whether any given class member is bound by these terms. *See* Doc. 99, p. 29.  The Court believes that for purposes of predominance this issue presents a much closer question than the aforementioned defenses of voluntary payment and sovereign immunity, given that it is indisputably the case that there are many class members whose claims arise from activity occurring after the mandatory arbitration and class action waiver provision was put into place.  However, the Court would also note that there is currently pending a motion by GTL to compel Mr. Hobbs to arbitrate his claims pursuant to such a provision, *see* Doc. 133, and that this motion is not yet ripe.  The Court believes it is likely that the briefing on this motion, and the Court's ultimate decision on it, will shed much-needed light on the factual and legal context for this issue as it relates to predominance.  Given how heavily all of the other Rule 23 factors presently weigh in favor of class certification, and given that certification of a class at this stage is inherently conditional and subject to decertification should circumstances warrant it, the Court believes the most prudent use of judicial resources would be to defer decision on the issue of the waiver's implications for predominance to a later time in these proceedings, for example through a motion for decertification.  *See Hervey v. City of Little Rock*, 787 F.2d 1223, 1227 (8th Cir. 1986) ("The court's duty to assure compliance with Rule 23(a) continues even after certification

. . . ."); Fed. R. Civ. P. 23(c)(1)(C) ("An order that grants or denies class certification may be altered or amended before final judgment.").

Finally, GTL argues that variations from state to state in the elements of unjust enrichment defeat predominance. *See* Doc. 99, pp. 28–29. The Court disagrees, because the critical issue here for purposes of predominance is not whether the elements vary, but rather whether common evidence can be used to satisfy them in a *prima facie* case. Here, common evidence can suffice, because none of the variances in elements that GTL has pointed to requires individualized inquiry into the unique circumstances of particular class members. *See generally* Doc. 106-14 (chart prepared by GTL surveying differences among states' unjust-enrichment elements). No matter which state's elements are used, the pertinent facts as alleged by Plaintiffs, and the evidence they intend to offer, are the same for every putative class member: that GTL exploited its exclusive contracts for provision of inmate calling services at correctional facilities by recouping from its customers the site commissions it paid those facilities, or by charging its customers deposit fees on prepaid accounts that were far in excess of the actual cost for processing those deposits. The Court recognizes that there are many conceivable circumstances where the allegations underlying a putative class action could be such that variances among different states' unjust-enrichment elements would be material. But that does not appear to be the situation in this case.

Neither of the two specific elemental variances that GTL highlights in its Brief is availing. One such variance is that it appears Michigan's law of unjust enrichment might require a plaintiff to have *directly* conferred a benefit on a defendant that was unjustly

retained, while other states in its subclass permit *indirect* conferral.[10]  GTL contends that

this requirement of direct conferral matters because "Plaintiffs' proposed class includes

inmates who purchased prepaid calling cards from a correctional facility, not GTL."  (Doc.

99, p. 29).  But as the Court discussed is Section III.A, *supra*, the funds on a prepaid card

belong to the inmate who owns the card, regardless of how they got there.  And Plaintiffs

are not seeking to recover the money they paid to the correctional facility in exchange for

the right to own the funds on the prepaid calling cards; they are seeking to recover money

they paid *directly* to GTL from the funds that were on their prepaid calling cards when

they used those cards to purchase minutes from GTL.  And although GTL characterizes

New Hampshire unjust-enrichment law as "consider[ing] the wrongfulness of [a]

defendant's conduct" while other states in its subclass do not, there is actually no material

difference here; New Hampshire permits recovery of unjust enrichment in the absence of

wrongful acts where there is "passive acceptance of a benefit that would be

unconscionable to retain."  *See Kowalski v. Cedars of Portsmouth Condominium Ass'n*,

769 A.2d 344, 347 (N.H. 2001).

Ultimately, under the facts of the instant case, variations in unjust enrichment laws

from state to state bear much less on the issue of predominance than on the final Rule

23(b)(3) factor—whether a class action is superior to other available methods for fairly

---

[10] So far this Court has only found unpublished decisions explicitly holding thus, and even many of those decisions seem equivocal on whether the requirement of direct conferral is true black-letter law, or is rather simply a result that typically flows from Michigan's requirement that the doctrine of unjust enrichment should be employed "with caution." *See, e.g.*, *Smith v. Glenmark Generics, Inc., USA*, 2014 WL 4087968, at *1 (Mich. Ct. App. Aug. 19, 2014) (collecting cases) ("Notably, caselaw does not specifically state that the benefit must be received *directly* from the plaintiff, but these decisions make it clear that it must." (emphasis in original)).

and efficiently adjudicating the controversy.  And as with predominance, the Court finds that this factor weighs in favor of class certification.  Given the common evidence that will be used at trial, whatever variances may exist within a particular subclass among different states' elements for unjust enrichment can be adequately addressed through the use of special verdict forms.  Although the verdict forms and accompanying jury instructions in this case might be a little more complicated in this regard than what would be used in separate cases prosecuted on a state-by-state basis, the Court is confident, at least for now, that it is capable of managing this task without confusing the jury, and that the efficiencies realized by consolidating all of these claims into one forum far outstrip the difficulties.

If a class action is not certified, the only other means of which the Court is aware by which class members may prosecute their claims are either to bring individual lawsuits or to lodge individual administrative complaints with the FCC under 47 U.S.C. § 208.  The former alternative is plainly impractical given the low amount of damages suffered by the typical individual class member relative to the prohibitive cost of bringing a lawsuit.  And the latter alternative is plainly inferior to a class action, in light of "the class members' interests in individually controlling the prosecution or defense of separate actions," and "the desirability or undesirability of concentrating the litigation of the claims in [this] particular forum."  Fed. R. Civ. P. 23(b)(3)(A).  Although an administrative proceeding under § 208 may be a far less expensive affair for a claimant than an individual lawsuit would be, it would also be a very rushed affair, *see* § 208(b)(1), in which none of the parties would have the opportunity to conduct the sort of thorough discovery and vigorous prosecution of their respective positions that can be undertaken in this Court.  Finally, the

Court is unaware of any other lawsuits already begun against GTL with claims overlapping those brought by the class members in this case. *See* Fed. R. Civ. P. 23(b)(3)(B); Doc. 93-2, ¶ 51; Doc. 92, ¶¶ 1–2.

## IV. CONCLUSION

**IT IS THEREFORE ORDERED** that Plaintiffs Kaylan Stuart's, Dustin Murilla's, Walter Chruby's, and Rocky Hobbs's Motion for Class Certification, Appointment of Class Representatives and Appointment of Class Counsel (Doc. 92) is **GRANTED** as follows:

**IT IS ORDERED** that named Plaintiffs Kaylan Stuart, Dustin Murilla, Walter Chruby, and Rocky Hobbs are appointed as representatives of the following class, the "FCA Class," which is certified to pursue a common claim under the FCA:

> All persons in the United States[11] who, at any time within the applicable limitations period: (1) paid to use inmate calling services provided by Global Tel*Link (including its operating subsidiaries) to make or receive one or more interstate phone calls from a correctional facility during a period of time when Global Tel*Link paid the facility[12] a commission of any type in connection with the interstate calls; and/or (2) paid deposit fees to Global Tel*Link in order to fund a prepaid account used to pay for any interstate calls.

---

[11] Excluded from the proposed Class are any persons who paid to use Global Tel*Link's inmate calling services in order to make or receive telephone calls from a correctional facility in New Jersey.

[12] GTL often contracts with correctional agencies, such as a state's Department of Corrections, that oversee multiple correctional facilities. For purposes of this Motion, and consistent with industry practices, the term "facilities" or "facility" refers to the correctional facilities as well as the corresponding correctional agency overseeing the correctional facilities.

**IT IS FURTHER ORDERED** that the following subclasses (the "UE Subclasses") are certified to pursue claims for unjust enrichment under the laws of the specified states, with the referenced Plaintiff appointed as the representative of such subclass:[13]

**The Arkansas UE Subclass (Kaylan Stuart):** All persons who, while in Arkansas, California, Connecticut, Hawaii, Indiana, Iowa, Michigan, Nebraska, New Hampshire, South Carolina, Vermont or West Virginia, within the applicable limitations period, paid to use inmate calling services provided by Global Tel*Link (including its operating subsidiaries) to make or receive one or more interstate phone calls from a correctional facility during a period of time when Global Tel*Link paid the facility a commission of any type in connection with the interstate calls.

**The Minnesota UE Subclass (Dustin Murilla):** All persons who, while in Minnesota, Alaska, Ohio, Tennessee, Utah or Washington, within the applicable limitations period, paid to use inmate calling services provided by Global Tel*Link (including its operating subsidiaries) to make or receive one or more interstate phone calls from a correctional facility during a period of time when Global Tel*Link paid the facility a commission of any type in connection with the interstate calls.

**The Pennsylvania UE Subclass (Walter Chruby):** All persons who, while in Pennsylvania, Georgia, Florida, Idaho, Kansas, Kentucky, Maryland, Maine, Mississippi, Missouri, New Mexico, Nevada, Oregon, South Dakota, Virginia or Wisoncsin, within the applicable limitations period, paid to use inmate calling services provided by Global Tel*Link (including its operating subsidiaries) to make or receive one or more interstate phone calls from a correctional facility during a period of time when Global Tel*Link paid the facility a commission of any type in connection with the interstate calls.

**The Texas UE Subclass (Rocky Hobbs):** All persons who, while in Texas, Arizona, Colorado, Delaware, Illinois, Louisiana, Massachusetts, New Jersey, North Dakota or Oklahoma, within the applicable limitations period, paid to use inmate calling services provided by Global Tel*Link (including its operating subsidiaries) to make or receive one or more interstate phone calls from a correctional facility during a period of time when Global Tel*Link paid the facility a commission of any type in connection with the interstate calls.

---

[13] Excluded from the UE Subclasses are any persons who paid to use Global Tel*Link's inmate calling services in order to make or receive telephone calls from a correctional facility in New Jersey.

**IT IS FURTHER ORDERED** that the law firms of Kessler Topaz Meltzer & Check, LLP ("KTMC"), Berger & Montague, P.C. ("BM"), Saltz Mongeluzzi Barrett & Bendesky P.C. ("SMBB"), and Cohen Milstein Seller & Toll, PLLCA ("CM") are appointed as Co-Lead Class Counsel serving on a Co-Lead Class Counsel Committee, with KTMC serving as the Chair of such Committee.  Amy C. Martin, Esq. is appointed as Liaison Class Counsel.

**IT IS FURTHER ORDERED** that Notice to the Class, in a form approved by the Court, shall be disseminated in accordance with a Notice program to be approved by the Court following consideration of the parties' proposal(s) for the form and manner of Notice, which proposal(s) shall be submitted to the Court within fourteen (14) days of the date of this Order.

**IT IS SO ORDERED** on this 3rd day of February, 2017.


   _/s/ Timothy L. Brooks_____
   TIMOTHY L. BROOKS
   UNITED STATES DISTRICT JUDGE