**IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
FAYETTEVILLE DIVISION**


**SUSAN MOJICA and THOMAS MOJICA**                                    **PLAINTIFFS**

**V.**                                    **CASE NO. 5:14-CV-5258**

**SECURUS TECHNOLOGIES, INC.**                                    **DEFENDANT**


and


**IN RE GLOBAL TEL\*LINK**                                    **CASE NO. 5:14-CV-5275**
**CORPORATION ICS LITIGATION**


**MEMORANDUM OPINION AND ORDER**

These two cases are nationwide class action lawsuits involving rates and fees

charged for the provision of inmate calling services ("ICS") to prisoners and their loved

ones. The defendants, Securus Technologies, Inc. ("Securus") and Global Tel\*Link

Corporation ("GTL") are ICS providers; and the plaintiffs and class members are users of

ICS. The lawsuit against Securus is brought by Susan and Thomas Mojica; and the

lawsuit against GTL is brought by Kaylan Stuart, Dustin Murilla, Walter Chruby, and

Rocky Hobbs. In both cases, the plaintiffs seek to recover allegedly exorbitant rates and

fees they paid to the defendants, bringing claims under the Federal Communications Act

("FCA") and the common law of unjust enrichment.

These lawsuits against Securus and GTL were filed in August and September of

2014, respectively. This Court previously certified nationwide classes in both cases on

February 3, 2017. But since that time, several events have transpired that significantly

undermined the rationale for those prior class certifications. In the meantime, a large

number of motions has been filed in both of these cases. In this Opinion and Order, the Court will rule on all such pending motions that request class decertification, summary judgment, or primary jurisdiction referral. As a consequence of those rulings, both nationwide classes will be decertified, and the named plaintiffs' individual claims in both cases will be dismissed with prejudice.

## I. BACKGROUND

In February 2000, a woman named Martha Wright, along with other similarly situated individuals, filed a class action complaint in the United States District Court for the District of Columbia against a variety of defendants (including those named in the instant cases). The plaintiffs in that lawsuit alleged that various telephone companies entered into exclusive agreements to provide ICS at correctional facilities throughout the United States and exploited those monopolies by charging unjust and unreasonable rates for inmate phone calls in violation of the FCA, thereby unjustly enriching themselves. *See* Case No. 5:14-cv-5258, Doc. 36, p. 2; Case No. 5:14-cv-5275, Doc. 29, p. 2. In 2001, the Wright lawsuit was stayed, pending the resolution of related proceedings before the Federal Communications Commission ("FCC"). *See id.* Twelve years later, in September 2013, the FCC instituted an interim regulatory scheme designed to prospectively curb the practices complained of in the Wright lawsuit. *See* Case No. 5:14-cv-5258, Doc. 36, p. 3; Case No. 5:14-cv-5275, Doc. 29, p. 3.

As noted above, these two lawsuits were filed in this Court the following year, in 2014. But importantly, the two instant lawsuits are not the only lawsuits that were filed in this Court against these defendants regarding ICS. The instant lawsuits are concerned solely with rates and fees associated with *inter*state calls. But after these two lawsuits

were filed, two other lawsuits dealing only with *intra*state calls were filed in this Court: one against GTL in June 2015, *see Chruby et al. v. Global Tel\*Link Corp.*, Case No. 5:15-cv-1536, and one against Securus in January 2017, *see Antoon v. Securus Techs., Inc.*, Case No. 5:17-cv-5008.

In 2015, the FCC entered a *Second Report and Order and Third Further Notice of Proposed Rulemaking In the Matter of Rates for Interstate Inmate Calling Services*, 30 FCC Rcd. 12763 (2015) ("*Second Report and Order*"), that imposed caps on the amounts that ICS providers could charge consumers in calling rates and ancillary fees. As noted above, on February 3, 2017, this Court entered orders in the two instant cases, certifying nationwide classes on the plaintiffs' claims under the FCA for unjust and unreasonable calling rates and deposit fees on prepaid accounts, along with multi-state subclasses on the plaintiffs' claims under state common law for unjust enrichment from calling rates. The plaintiffs' theory of liability for class certification depended on the proposition that "site commissions," which the defendants would pay to states in order to obtain ICS contracts, were not legitimate costs of business, and that it was unjust and unreasonable for the defendants to recoup site commissions from the class members through inflated calling rates and deposit fees.

However, four months later in the case of *Global Tel\*Link v. FCC*, 866 F.3d 397 (D.C. Cir. 2017), the United States Court of Appeals for the D.C. Circuit reversed and remanded the *Second Report and Order* in part on the grounds that site commissions *are* legitimate costs of business when they are a condition precedent to obtaining ICS contracts. Then, five months after that, this Court entered an order denying certification of an Arkansas unjust enrichment class in the intrastate case of *Chruby*, Case No. 5:15-

cv-1536, and suggested that its reasons for doing so might also warrant decertification of the unjust-enrichment classes in the instant two interstate cases of *Mojica v. Securus Techs., Inc.*, Case No. 5:14-cv-5258, and *In re Global Tel*Link Corp. ICS Litig.*, Case No. 5:14-cv-5275 ("*In re GTL*"). Now, nine months and several stays later, the Court finally takes up the issues in these two cases that were foreshadowed by the D.C. Circuit opinion and this Court's denial of class certification in *Chruby*. The discussion that follows will begin with the issue of decertification, in conjunction with the plaintiffs' pending requests for primary jurisdiction referral to the FCC.[1] Then, the Court will turn to the parties' pending requests for summary judgment.

## II. DISCUSSION

### A. DECERTIFICATION AND PRIMARY JURISDICTION

The Court has previously explained the legal standard for primary jurisdiction referral as follows:

> The doctrine of primary jurisdiction is a common-law doctrine that "allows a district court to refer a matter to the appropriate administrative agency for a ruling in the first instance, even when the matter is initially cognizable by the district court." *Access Telecomm. v. Southwestern Bell Telephone Co.*, 137 F.3d 605, 608 (8th Cir. 1998). The doctrine "applies where a claim is originally cognizable in the courts, and comes into play whenever enforcement of the claim requires the resolution of issues which, under a regulatory scheme, have been placed within the special competence of an administrative body." *Alpharma, Inc. v. Pennfield Oil Co.*, 411 F.3d 934, 938 (8th Cir. 2005) (internal quotation marks omitted).

> "The contours of primary jurisdiction are not fixed by a precise formula." *Id.* Primary jurisdiction is typically invoked to make use of agency expertise, or to promote uniformity and consistency within the particular field of regulation. *Access Telecomm.*, 137 F.3d at 608. The doctrine of primary jurisdiction "is to be 'invoked sparingly, as it often results in added expense

---

[1] Securus previously filed a motion for primary jurisdiction referral in *Mojica* at Doc. 200, but it subsequently indicated it wishes to withdraw that motion. *See Mojica*, Case No. 5:14-cv-5258, Doc. 340.

and delay.'" *Alpharma, Inc.*, 411 F.3d at 938. However, "[c]ourts have consistently held that claims of unjust and unreasonable practices under 47 U.S.C. § 201(b) fall within the primary jurisdiction of the FCC." *Scott v. Pub. Comm. Servs.*, 2012 WL 381780, at *3 (E.D. Mo. Feb. 6, 2012).

*Mojica*, 2015 WL 429997, at *2–*3 (W.D. Ark. Jan. 9, 2015).

The Court has also previously described the legal standard for class certification, of which the parties are of course all well aware—under Rule 23, certifying a class action requires a two-step analysis, the first step of which considers whether the requirements of numerosity, commonality, typicality, and fair and adequate representation are satisfied, and the second step of which determines whether the requirements of predominance and superiority are satisfied. *See In re GTL*, 2017 WL 471571, at *3 (Feb. 3, 2017). However, "[a]n order that grants . . . class certification may be altered or amended before final judgment," Fed. R. Civ. P. 23(c)(1)(C), and the Court has a continuing duty to assure compliance with Rule 23 after certification, *see Hervey v. City of Little Rock*, 787 F.2d 1223, 1227 (8th Cir. 1986). And while the party seeking class certification bears the burden of showing that Rule 23's requirements are satisfied when it is initially sought, *see Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011), a party moving for decertification typically bears "a more onerous burden" of showing decertification is warranted when "the initial certification decision was carefully considered and made after certification-related discovery," as was the case here. *See Day v. Celadon Trucking Servs., Inc.*, 827 F.3d 817, 832 & n.9 (8th Cir. 2016). Nevertheless, a district court "has the discretion to decertify a class by amending the order granting the certification if the court finds that certification should not have been granted or is no longer appropriate." *East Maine Baptist Church v. Union Planters Bank, N.A.*, 244 F.R.D. 538, 541 (E.D. Mo.

2007). "In considering a defendant's motion for decertification, the Court follows the legal standard required for class certification." *Id.*

Below, the Court will first consider the nationwide classes that were certified on the FCA claims, beginning with the claims for unjust and unreasonable calling rates, and then turning to the claims for unjust and unreasonable deposit fees. Then, the Court will take up the multi-state subclasses that were certified on the unjust enrichment state law claims.

### 1. FCA Claims

### a. Calling Rates

In early February 2017, this Court certified nationwide classes in both *Mojica* and *In re GTL* on the plaintiffs' claims under the FCA for unjust and unreasonable ICS rates. In both cases, the plaintiffs advanced a theory of liability under which the proposed class members would all recover the portion of their ICS rates constituting the costs of site commissions that were passed along to consumers. Both defendants opposed class certification in part (and primarily) on the grounds that "it is not necessarily or per se unreasonable . . . to pass along the cost of site commissions to the consumers of . . . [ICS]," *see Mojica*, 2017 WL 470910, at *7 (W.D. Ark. Feb. 3, 2017), and that such a "one-size-fits-all theory is untenable as a matter of law," *see In re GTL*, 2017 WL 471571, at *6 (W.D. Ark. Feb. 3, 2017). The Court granted class certification over these objections because regardless of whether the plaintiffs' theory of liability would ultimately prove correct, it did not appear at that time to be obviously foreclosed by any binding legal authority and it posed common questions of fact and law that predominated over individual ones. *See Mojica*, 2017 WL 470910, at *7 (W.D. Ark. Feb. 3, 2017); *In re GTL*,

2017 WL 471571, at *6 (W.D. Ark. Feb. 3, 2017). However, the Court also observed that if the defendants ultimately prevailed on the issue of whether it was per se unreasonable to pass the cost of site commissions on to consumers, then that might cause common issues no longer to predominate and therefore warrant decertifying the classes. *See Mojica*, 2017 WL 470910, at *7 (W.D. Ark. Feb. 3, 2017); *In re GTL*, 2017 WL 471571, at *6 (W.D. Ark. Feb. 3, 2017).

Four months later, on appellate review of the FCC's *Second Report and Order*, which had excluded site commission payments from the costs used to set ICS rate caps, the D.C. Circuit vacated those rate caps and remanded to the FCC for further factfinding and rulemaking. In so doing, the D.C. Circuit held that the FCC had acted arbitrarily and capriciously by excluding site commissions from its calculus, observing that this "defies reasoned decisionmaking because site commissions obviously are costs of doing business incurred by ICS providers." *Global Tel*Link*, 866 F.3d at 413. The D.C. Circuit went on to state that it "simply cannot comprehend the agency's reasoning," calling the exclusion of site commissions "hard to fathom," "implausible," and an action that "makes no sense." *See id.* The D.C. Circuit explained its holding as follows:

> If agreeing to pay site commissions is a condition precedent to ICS providers offering their services, those commissions are related to the provision of ICS. And it does not matter that the states may use the commissions for purposes unrelated to the activities of correctional facilities. The ICS providers who are required to pay the site commissions as a condition of doing business have no control over the funds once they are paid. None of the other reasons offered by the Commission to justify the categorical exclusion of site commissions passes muster.

*Id.* (internal quotation marks and citations omitted). Furthermore, the D.C. Circuit observed that "the categorical exclusion of site commissions cannot be easily squared

with the requirements of [47 U.S.C.] § 276 and § 201" that payphone service providers be fairly compensated and that rates be just and reasonable. *See id.*

The defendants contend that the June 2017 D.C. Circuit opinion requires decertifying the nationwide FCA classes with respect to the plaintiffs' claims for unjust and unreasonable phone rates. The plaintiffs disagree.

The first order of business in resolving this point of contention is to determine the extent, if any, to which the D.C. Circuit opinion is binding on this Court. 28 U.S.C. § 2342(1) vests "exclusive jurisdiction" in "[t]he court of appeals (other than the United States Court of Appeals for the Federal Circuit)" to "enjoin, set aside, suspend (in whole or in part), or to determine the validity of . . . all final orders of the [FCC] made reviewable by section 402(a) of title 47." And when such appeals are lodged in multiple circuits, 28 U.S.C. § 2112 requires the multidistrict litigation panel to consolidate them into one circuit. Thus, *the FCC* is certainly bound by the D.C. Circuit's opinion, and it seems very likely that the Eighth Circuit would view it, at a minimum, as extremely persuasive authority to whatever extent it speaks to the issues in the instant cases. *Cf. Aldens, Inc. v. Miller*, 610 F.2d 538, 541 (8th Cir. 1979) ("Although we are not bound by another circuit's decision, we adhere to the policy that a sister circuit's reasoned decision deserves great weight and precedential value. As an appellate court, we strive to maintain uniformity in the law among the circuits, wherever reasoned analysis will allow, thus avoiding unnecessary burdens on the Supreme Court docket."). And at any rate, this Court may not issue an award under 47 U.S.C. § 207 that could not be issued by the FCC. *See Global Crossing Telecomms., Inc. v. Metrophones Telecomms., Inc.*, 550 U.S. 45, 52–53 (2007). In light of the foregoing authorities, this Court believes it has a duty—whether required by law or

mere prudence—to ensure that its rulings in the instant cases are not inconsistent with the laws that will govern any future rulemaking or adjudication in the matter of ICS rates that the FCC might undertake. And that means this Court's rulings in the instant cases should not conflict with the holdings in the D.C. Circuit opinion.

A theory of recovery that would permit disgorgement of all site commissions that were passed on as costs to consumers would be flatly inconsistent with the D.C. Circuit opinion. The plaintiffs would distinguish the D.C. Circuit opinion from the instant cases, pointing out that the instant cases seek retroactive relief in the form of damages for past misconduct while the D.C. Circuit opinion concerns the arbitrary and capricious nature of a prospective rulemaking. But while this is a distinction that is technically correct, it seems to this Court that it splits an extremely thin hair and ignores the reasoning that undergirds the D.C. Circuit's holding. The plain fact of the matter is that the theory of liability under which the classes were certified would require this Court to do the very thing that the D.C. Circuit has prohibited the FCC from doing: assuming per se that site commissions are not a legitimate cost of doing business.

Furthermore, no other theory of liability has been offered that would permit common issues to predominate without running afoul of the D.C. Circuit's reasoning, nor is this Court presently able to conceive of any. In the same opinion, the D.C. Circuit also held that it was arbitrary and capricious for the FCC to use industry-wide averages in setting rate caps, in part because "the record shows that regional variation, not efficiency accounts for cost discrepancies among providers." *See Global Tel\*Link*, 866 F.3d at 415. In other words, if this Court permits a nationwide class of plaintiffs to recover damages for unjust and unreasonable rates without regard to regional variation in costs, then it will

be proceeding under a legal theory that the D.C. Circuit has held the FCA effectively prohibits the FCC from employing when regulating this industry.

The plaintiffs ask this Court to refer the following question to the FCC before decertifying the FCA classes' claims for ICS rates:

> When adjudicating a claim that [a defendant]'s rates are unjust and unreasonable under the [FCA], what criteria should the Court consider in determining which portions of [that defendant]'s commission costs are directly related to providing inmate calling services?

*See* Case No. 5:14-cv-5258, Doc. 366, p. 1; Case No. 5:14-cv-5275, Doc. 196, p. 1. But this Court does not believe any guidance is needed from the FCC on this matter, because the D.C. Circuit has already clearly addressed it: "If agreeing to pay site commissions is a condition precedent to ICS providers offering their services, those commissions are related to the provision of ICS." *Global Tel\*Link*, 866 F.3d at 413 (internal quotation marks omitted).

The FCA classes will be decertified with respect to claims for unjust and unreasonable calling rates because, in light of the D.C. Circuit opinion, common issues no longer predominate over individual ones. The matter will not be referred to the FCC for additional guidance or clarification, because none is needed.

### b. Deposit Fees

The defendants argue that the D.C. Circuit's June 2017 opinion also requires decertification of the FCA classes with respect to claims for unjust and unreasonable deposit fees. In addition to capping ICS rates, the FCC order that the D.C. Circuit reviewed in that opinion had also limited and capped the types and amounts of ancillary fees that ICS providers could impose on users of ICS. On appeal, the petitioners challenged the FCC's authority under the FCA to regulate ancillary fees generally, as well

as its authority to regulate intrastate ancillary fees in particular.  The D.C. Circuit accepted in part and rejected in part these challenges, holding:

> Contrary to Petitioners' contentions, the *Order*'s imposition of ancillary fee caps in connection with *interstate* calls is justified.  The [FCC] has plenary authority to regulate interstate rates under [47 U.S.C.] § 201(b), including "practices . . . for and in connection with" interstate calls.  The *Order* explains that ICS providers use ancillary fees as a loophole in avoiding per-minute rate caps.  Furthermore, ancillary fees for *interstate* calls satisfy the test of the [FCC]'s authority under § 201(b) as they are "in connection with" interstate calls.  However, these considerations do not fully answer the question whether the disputed imposition of ancillary fee caps is permissible.
>
> As noted above, we have found that, on the record in this case, the *Order*'s imposition of *intrastate* rate caps fails review under § 276.  Therefore, we likewise hold that the FCC had no authority to impose ancillary fee caps with respect to *intrastate* calls.  However, we cannot discern from the record whether ancillary fees can be segregated between interstate and intrastate calls.  We are therefore obliged to remand the matter to the FCC for further consideration.

*Global Tel*Link*, 866 F.3d at 415 (internal citation omitted) (emphasis in original).

In other words, the FCC may cap ancillary fees with respect to interstate calls, but only to the extent that they can be segregated from those for intrastate calls.  The defendants argue that the plaintiffs have failed to propose a methodology for doing this that would satisfy Rule 23(b)(3)'s requirement that common questions of fact predominate over individual ones.  This Court agrees with the defendants.

The prepaid accounts into which ICS users make credit-card deposits are not themselves segregated between interstate and intrastate calls; an ICS user may pay for interstate and instrastate calls from the same prepaid account.  For prepaid accounts that have been used to pay only for interstate calls or only for intrastate calls, it is of course a very simple matter to determine that the deposit fees associated with that account were assessed in connection with the only type of call that was paid by that account, whether

inter- or intrastate.  But for the many prepaid accounts that have been used to pay for both inter- and intrastate calls, the task is not so simple.

The methodology proposed by the plaintiffs for segregating interstate deposit fees from intrastate deposit fees on such mixed-use accounts is simply to determine the percentage of calling charges on that account that were associated with interstate calls, and then to assume that an identical percentage of the deposit fees on that account were associated with interstate calls.  *See* Case No. 5:14-cv-5258, Doc. 143-1, p. 8; Case No. 5:14-cv-5275, Doc. 116-1, p. 5.  But although this is a simple and workable method, it is not at all clear to the Court that it is an economically or legally viable one.

Take the hypothetical example of a prepaid account that was funded once, incurring a deposit fee of $5, and that was subsequently used to pay for only two calls: one $4 interstate call, and one $6 intrastate call.  Under the plaintiffs' methodology, $2 of the deposit fee is associated with the interstate call, and the remaining $3 of the deposit fee is associated with the intrastate call.  But the plaintiffs do not explain why the allocation should be based on revenue from calls rather than on calls themselves.  Why not associate $2.50 of the deposit fee with the one interstate call and the remaining $2.50 of the deposit fee with the one intrastate call?  Or still yet, why associate any of the deposit fee at all with the interstate call if the accountholder would have paid the same deposit fee to make the intrastate call even if the interstate call had never been made?  After all, since the D.C. Circuit held that the FCC may not cap ancillary fees associated with intrastate calls, it would seem the FCA presents no obstacle to doing so.

At bottom, the D.C. Circuit's opinion held that the FCC "has no authority" to regulate ancillary fees except to the extent those for interstate calls "can be segregated"

from intrastate calls. *See Global Tel*Link*, 866 F.3d at 415. And 47 U.S.C. § 207 does not provide a private right of action for injuries that the FCC lacks authority to regulate under 47 U.S.C. § 201(b). *See Global Crossing Telecomms., Inc.*, 550 U.S. at 52–53. Yet, the FCA class that was previously certified on the issue of deposit fees contains a large number of class members whose deposit fees for interstate calls cannot be segregated from their deposit fees for intrastate calls, and who therefore lack a private right of action. However, this problem cannot simply be remedied by redefining the class to exclude all holders of mixed-use accounts. For example, consider a different hypothetical account in which only two deposits were made: the first was used to pay only for interstate calls, and then after that deposit was completely exhausted, a second deposit was made and then used to pay only for intrastate calls. It would appear that *this* hypothetical class member's deposit fees *can* be segregated between interstate and intrastate calls.

The plaintiffs ask this Court to refer the following question to the FCC before decertifying the FCA classes' claims for ICS rates:

> What is the appropriate method for segregating interstate from intrastate ancillary fees so that the ancillary fees can be evaluated under the FCA?

*See* Case No. 5:14-cv-5258, Doc. 366, p. 1; Case No. 5:14-cv-5275, Doc. 196, p. 1. But the Court sees no reason to believe that the FCC's answer to this question would yield any workable solution to the problems of class-wide adjudication described above. The FCA classes will be decertified with respect to claims for unjust and unreasonable deposit fees because, in light of the D.C. Circuit opinion, common issues no longer predominate over individual ones. The matter will not be referred to the FCC for additional guidance or clarification.

## 2. Unjust Enrichment Claims

In the intrastate case against GTL—*Chruby*, Case No. 5:15-cv-5136—this Court declined to certify a class on those plaintiffs' claims for unjust enrichment, on the grounds that the availability of a common-law defense called the "voluntary payment doctrine" prevented common issues from predominating over individual ones as required by Rule 23(b)(3). Observing that "[t]he voluntary payment doctrine holds that 'payments which are voluntarily made cannot be recovered except for payments made as a result of duress, fraud, mistake or failure of consideration,'" *Chruby v. Global Tel*Link Corp.*, 2017 WL 4320330, at *7 (W.D. Ark. Sept. 28, 2017) (quoting *Gautrau v. Long*, 271 Ark. 394, 396 (Ark. Ct. App. 1980)), the Court noted that this was a defense "that GTL could assert against *every single member* of the proposed unjust enrichment classes," and that determining whether one of the exceptions to that defense (*e.g.*, fraud, duress, mistake of fact, coercion, or extortion) applied to any given class member's claims "would be an inherently individualized inquiry"—indeed, "not only into each member's personal circumstances, but even into the particular circumstances surrounding *each call*," *see id.* at *9 (emphasis in original). To illustrate this point, the Court proposed various hypothetical examples of inmates who, in some circumstances, might feel an enormous amount of psychological distress without using the ICS provided by GTL, but in other circumstances, may have felt relatively indifferent to whether ICS was available on a particular occasion but nevertheless used it simply because it was available and convenient. *See id.* When making its ruling, the Court "acknowledge[d] a certain inconsistency in outcome between its decisions to certify unjust enrichment classes in the interstate cases (particularly the GTL one) and its decision *not* to certify unjust enrichment

classes in the instant case," but promised eventually to "take whatever measures are appropriate . . . to restore consistency to its rulings in these ICS cases." *See Chruby v. Global Tel\*Link Corp.*, 2017 WL 4320330, at \*12 (W.D. Ark. Sept. 28, 2017).

The Court presently believes that the same concerns informing its decision not to certify intrastate unjust enrichment classes warrant decertifying the interstate unjust enrichment classes in both *Mojica* and *In re GTL*. For any given phone call, it is impossible to know whether a class member's use of ICS on that occasion was voluntary or the product of, *e.g.*, duress, without examining the particular circumstances surrounding that call, including the contents of the call itself. Surely a phone call between an inmate and his dying mother would defeat a voluntary-payment defense; but it seems unlikely the same could be said for a phone call between an inmate and a journalist made at the journalist's expense. The Court has little doubt that there are a great many calls that could defeat a voluntary-payment defense, but that is not the issue under Rule 23(b)(3); rather, the issue is whether this can be adjudicated without overwhelmingly individualized inquiry. The Court believes it cannot be, and that this means the unjust enrichment classes in these two interstate cases never should have been certified. Therefore, they will be decertified.

### B.  SUMMARY JUDGMENT

The Court now turns to the motions for summary judgment that are pending on the named plaintiffs' individual claims. "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). When, as here, cross-motions for summary judgment are filed, each motion should be reviewed in its own right, with each

side "entitled to the benefit of all inferences favorable to them which might reasonably be drawn from the record." *Wermager v. Cormorant Twp. Bd.*, 716 F.2d 1211, 1214 (8th Cir. 1983). The Court must view the facts in the light most favorable to the non-moving party, and give the non-moving party the benefit of any logical inferences that can be drawn from the facts. *Canada v. Union Elec. Co.*, 135 F.3d 1211, 1212-13 (8th Cir. 1997). The moving party bears the burden of proving the absence of any material factual disputes. Fed. R. Civ. P. 56(a); *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986).

If the moving party meets this burden, then the non-moving party must "come forward with 'specific facts showing that there is a genuine issue for trial.'" *Matsushita*, 475 U.S. at 587 (quoting then-Fed. R. Civ. P. 56(e)). These facts must be "such that a reasonable jury could return a verdict for the nonmoving party." *Allison v. Flexway Trucking, Inc.*, 28 F.3d 64, 66 (8th Cir. 1994) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). "The nonmoving party must do more than rely on allegations or denials in the pleadings, and the court should grant summary judgment if any essential element of the prima facie case is not supported by specific facts sufficient to raise a genuine issue for trial." *Register v. Honeywell Fed. Mfg. & Techs., LLC*, 397 F.3d 1130, 1136 (8th Cir. 2005) (citing *Celotex Corp v. Catrett*, 477 U.S. 317, 324 (1986)).

### 1. FCA Claims

The plaintiffs in *Mojica* have filed a Motion for Partial Summary Judgment, asking this Court to enter "judgment in their favor regarding their claim under the FCA for Defendant's practice of inflating interstate calling rates in order to pay site commissions." *See* Case No. 5:14-cv-5258, Doc. 237, p. 1. As described above in this Opinion and

Order, the D.C. Circuit's opinion (which was issued after the *Mojica* plaintiffs filed their Motion for Partial Summary Judgment) forecloses the theory that it is unjust and unreasonable under 47 U.S.C. § 201(b) for the defendants to pass on to users of ICS the cost of site commissions that are a condition precedent of doing business. Therefore, the *Mojica* plaintiffs' Motion for Partial Summary Judgment will be denied.

The defendants in both cases have also filed motions for summary judgment. Both defendants argue that the plaintiffs' FCA claims should be dismissed because there has never been any finding by the FCC that the challenged practices are unlawful—or at least none that can survive the D.C. Circuit opinion discussed above. As noted above, a lawsuit in federal district court may be brought under 47 U.S.C. § 207 only if "the FCC could properly hold that a carrier's [practice] is an 'unreasonable practice' deemed 'unlawful' under § 201(b)." *See Global Crossing Telecomms., Inc.*, 550 U.S. at 52–53. And as previously discussed, the D.C. Circuit opinion precludes the FCC from holding that the practice of passing on to ICS users the cost of site commissions that are a condition precedent of doing business. But that is the only theory of liability on which the named plaintiffs have premised their claims under the FCA for unjust and unreasonable calling rates. Therefore, those claims will be dismissed.

This issue is a bit more complicated with respect to the plaintiffs' claims under the FCA for unjust and unreasonable deposit fees. As was discussed above, the D.C. Circuit held that the FCC's authority to regulate ancillary fees for interstate calls is limited to those which "can be segregated" from ancillary fees for intrastate calls. *See Global Tel*Link*, 866 F.3d at 415. But it did affirm that, to the extent that such segregation can be accomplished, the FCC's imposition of ancillary fee caps in connection with interstate

calls would be "justified," because otherwise ICS providers could "use ancillary fees as a loophole in avoiding per-minute rate caps." *See id.*

However, while that particular holding speaks clearly to the FCC's authority to regulate ancillary fees for interstate calls, it says nothing about what costs the FCC should consider when engaging in such regulation. In the FCC order that was under review, the FCC had concluded that the ancillary fee caps it set therein would "allow ICS providers to recover the costs incurred for providing the ancillary service associated with the relevant fee." *See Second Report and Order*, 30 FCC Rcd. 12763, 12845 (2015). It seems clear that when setting those ancillary fee caps, the FCC did *not* account for site commissions as recoverable costs, given that earlier in that same order it had declined to consider site commissions as costs when setting calling rate caps on the grounds that they "often have nothing to do with the provision of ICS" and were "therefore irrelevant to the costs we consider." *See id.* at 12822 (internal quotation marks omitted). But as discussed above, the D.C. Circuit emphatically disagreed, holding that "[i]f agreeing to pay site commissions is a condition precedent to ICS providers offering their services, those commissions are related to the provision of ICS." *See Global Tel*Link*, 866 F.3d at 415. So although the D.C. Circuit remanded the matter of ancillary fee caps for further consideration without addressing their substantive reasonableness, it appears the D.C. Circuit would expect the FCC to take site commissions as recoverable costs into account when determining whether a given ancillary fee is "just and reasonable." *See* 47 U.S.C. § 201(b).

However, as with their claims for calling rates, the plaintiffs have not presented any theory of liability or damages on their deposit fee claims in either of the instant cases that

accounts for site commissions as recoverable costs. Since the plaintiffs have not advanced a methodology by which the FCC could properly hold, in the wake of the D.C. Circuit opinion, that their deposit fees were unjust or unreasonable, their deposit fee claims will likewise be dismissed. *See Global Crossing Telecomms., Inc.*, 550 U.S. at 52–53

## 2. Unjust Enrichment Claims

Turning now to the individual claims for unjust enrichment in these two cases: the defendants argue that they are entitled to summary judgment on these claims because they are preempted by federal law. The Court agrees.

47 U.S.C. § 414 states that "[n]othing in [the FCA] shall in any way abridge or alter the remedies now existing at common law or by statute, but the provisions of [the FCA] are in addition to such remedies." The Eighth Circuit interpreted this statute in *Firstcom, Inc. v. Qwest Corp.*, and held that while plaintiffs may bring state-law claims for violations of duties that are not imposed by the FCA, they may *not* bring state-law claims that "in actuality, seek recovery for [a defendant]'s alleged breach of duties imposed by [the FCA]." *See* 555 F.3d 669, 678 (8th Cir. 2009). The plaintiffs' FCA claims are premised on the allegation that the defendants charged them unjust and unreasonable rates for ICS, in violation of 47 U.S.C. § 201(b), which requires all charges by regulated entities for interstate phone calls to be "just and reasonable." *See* Case No. 5:14-cv-5258, Doc. 171, ¶ 45; Case No. 5:14-cv-5275, Doc. 126, ¶ 58. Likewise, the plaintiffs' unjust enrichment claims are premised on the allegation that the defendants unjustly enriched themselves at the plaintiffs' expense by "charging . . . rates and fees that are unjust, unreasonable, and greatly exceed market rates and costs of providing services." *See* Case No. 5:14-

cv-5258, Doc. 171, ¶ 50; Case No. 5:14-cv-5275, Doc. 126, ¶ 63. The operative complaint in each case further justifies its unjust enrichment claims by alleging that each defendant "is not entitled to this enrichment, [and] was prohibited from engaging in the acts and practices that generated this enrichment by § 201(b) of the FCA . . . ." *See* Case No. 5:14-cv-5258, Doc. 171, ¶ 52; Case No. 5:14-cv-5275, Doc. 126, ¶ 65. The plaintiffs nevertheless argue that their unjust enrichment claims are not merely derivative of 47 U.S.C. § 201(b), because "[a]ssuming that the [FCA] did not exist," then under state common-law the defendants still "would not be permitted to engage in" the charging of excessive rates alleged here. *See Firstcom*, 555 F.3d at 679.

But be that as it may, the FCA *does* exist, and 47 U.S.C. § 201(b) speaks directly to the matter of which the plaintiffs complain under either theory of liability: the charging of allegedly unjust and unreasonable rates for interstate phone calls. Since "state law is naturally preempted to the extent of any conflict with a federal statute," *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 372 (2000), this gives rise to the related question of whether the common-law of unjust enrichment "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of" the FCA, *see Wuebker v. Wilbur-Ellis Co.*, 418 F.3d 883, 887 (8th Cir. 2005) (quoting *Geier v. Am. Honda Motor Co.*, 529 U.S. 861, 873 (2000)). That question is especially salient in light of the D.C. Circuit's recent opinion in *GTL*, because the plaintiffs wish to pursue the very theory of liability under state law that this Court has concluded they cannot under the FCA: that the defendants "unjustly enriched [themselves] by using [their] monopoly power *to pass on the costs of site commissions*" to consumers of ICS. *See* Doc. 217, p. 17

(emphasis added). This Court agrees with the Seventh and Tenth Circuits[2] that "[47 U.S.C.] §§ 201 and 202, 'read together, demonstrate a congressional intent that individual long-distance customers throughout the United States receive uniform rates, terms and conditions of service,'" and that this "uniformity principle . . . of the FCA . . . preempts state law challenges to the reasonableness of the rates, terms, and conditions of service provided by telecommunications carriers" for interstate calls. *See In re Universal Serv. Fund Tel. Billing Practice Litig.*, 619 F.3d 1188, 1196–97 (10th Cir. 2010) (quoting *Boomer v. AT&T Corp.*, 309 F.3d 404, 418 (7th Cir. 2002)). To hold otherwise would result "in the very discrimination Congress sought to prevent" through 47 U.S.C. § 202(a)'s mandate that "[i]t shall be unlawful for any common carrier . . . to subject any particular . . . locality to any undue or unreasonable prejudice or disadvantage." *See In re Universal Serv. Fund*, 619 F.3d at 1197 (quoting *Boomer*, 309 F.3d at 423). *But see Ting v. AT&T*, 319 F.3d 1126, 1146 (9th Cir. 2003) (holding that "neither [California's Consumer Legal Remedies Act] nor California's unconscionability law conflicts with § 201(b) or § 202(a), because neither law interferes with Congress' chosen method in effectuating the purposes of the federal law"). Therefore, the plaintiffs' claims for unjust enrichment in both *Mojica*[3] and *In re GTL* will be dismissed with prejudice.

---

[2] This Court is unaware of any cases in which the Eighth Circuit has addressed the preemptive effect of the FCA's uniformity principle.

[3] Securus, unlike GTL, failed to specifically plead preemption as an affirmative defense in its Answer. *See* Case No. 5:14-cv-5258, Doc. 174, pp. 8–10. The *Mojica* plaintiffs contend that Securus has therefore waived the defense of preemption under Fed. R. Civ. P. 8(c). However, the Eighth Circuit has "eschewed a literal interpretation of the Rule that places form over substance, and instead ha[s] held that when an affirmative defense is raised in the trial court in a manner that does not result in unfair surprise, technical failure to comply with Rule 8(c) is not fatal." *First Union Nat'l Bank v. Pictet Overseas Trust Corp., Ltd.*, 477 F.3d 616, 622 (8th Cir. 2007) (internal quotation marks, citations, and

### III.  CONCLUSION

**IT IS THEREFORE ORDERED** that in the case of *Mojica v. Securus Techs., Inc.*, Case No. 5:14-cv-5258:

- Securus's Motion for Class Decertification (Doc. 224) is **GRANTED**;

- Securus's Motion for Summary Judgment (Doc. 232) is **GRANTED**;

- Plaintiffs' Motion for Partial Summary Judgment (Doc. 237) is **DENIED**; and

- Plaintiffs' Motion for Primary Jurisdiction Referral and Stay Pending Referral (Doc. 366) is **DENIED**,

as follows: all classes previously certified in this case are **DECERTIFIED**, and the named plaintiffs' individual claims are **DISMISSED WITH PREJUDICE**.  Judgment will enter separately and contemporaneously with this Order.

**IT IS FURTHER ORDERED** that in the case of *In re Global Tel*Link Corp. ICS Litig.*, Case No. 5:14-cv-5275:

- Plaintiffs' Motion for Primary Jurisdiction Referral and Stay Pending Referral (Doc. 196) is **DENIED**;

- GTL's Motion to Decertify Class and to Vacate Order Granting Class Certification (Doc. 203) is **GRANTED**; and

---

alterations omitted).  In addition to unfair surprise, the Eighth Circuit also considers unfair prejudice.  *See id.* at 623.  Here, the *Mojica* plaintiffs are neither unfairly surprised nor unfairly prejudiced by permitting Securus to assert the defense of preemption at this stage of proceedings, because: (1) they would have incurred the same expenses regardless of when this defense was asserted, given the similar nature of their unjust enrichment claims to their FCA claims; (2) they have been given "ample opportunity to respond to [the] defense," *see Coohey v. United States*, 172 F.3d 1060, 1064 n.8 (8th Cir. 1999); and (3) they are represented by the same attorneys who represent the plaintiffs in *GTL*—in which the defense of preemption was affirmatively pleaded as early as February 13, 2015.  *See* Case No. 5:14-cv-5275, Doc. 31, ¶ 75 (asserting that state law claims "are barred by the Supremacy Clause to the United States Constitution").

- GTL's Motion for Summary Judgment (Doc. 205) is **GRANTED,**

as follows: all classes previously certified in this case are **DECERTIFIED**, and the named plaintiffs' individual claims are **DISMISSED WITH PREJUDICE**. Judgment will enter separately and contemporaneously with this Order.

    **IT IS FURTHER ORDERED** that notice to the classes of this order, in a form approved by the Court, shall be disseminated in accordance with a notice program to be approved by the Court following consideration of the parties' proposal(s) for the form and manner of notice, which proposal(s) shall be submitted to the Court within fourteen (14) days of this Order.

    **IT IS SO ORDERED** on this _29th_ day of June, 2018.

                                                  _____

                                             TIMOTHY L. BROOKS
                                             UNITED STATES DISTRICT JUDGE